UNITED STATES of America,
Plaintiff-Appellant,

v.

Oscar CASTRO, Charles David Fraga,
Peter Diaz, and Thomas Acosta,
Defendants-Appellees.

No. 81–5823.

United States Court of Appeals,
Eleventh Circuit.

Jan. 30, 1984.

Stanley Marcus, U.S. Atty., Jeffrey L. Russell, Sonia Escobio O'Donnell, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellant.

Ronald A. Dion, Entin, Schwartz, Angert, Dion & Broudy, Spencer Levine, North Miami Beach, Fla., for defendants-appellees.

Herbert Abramson, Miami, Fla., for Acosta.

Before FAY and KRAVITCH, Circuit Judges, and ATKINS *, District Judge.

PER CURIAM:

Defendants-appellees Acosta, Castro, Diaz and Fraga were charged with conspiracy to possess and possession with intent to distribute approximately 46,000 pounds of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1) (1970) and 18 U.S.C. § 2 (1951). The district court held an evidentiary hearing on defendants' motion to suppress certain statements and evidence. It also heard testimony on the admissibility of coconspirators' hearsay statements pursuant to *United States v. James,* 590 F.2d 575 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). The trial court denied defendants' motion to suppress the contraband, but suppressed a statement made by defendant Acosta based upon its finding that such was obtained in violation of the procedural safeguards mandated by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In addition, finding insufficient independent evidence of a conspiracy, the court held that the hearsay declarations of coconspirators could not be received into evidence at trial. The government appealed both suppression orders. Concluding that Mr. Acosta's statement was not elicited in violation of his fifth amendment rights under *Miranda* and that there was sufficient independent evidence of a conspiracy to admit the hearsay statements of alleged coconspirators, we

---

* The Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

reverse both orders and remand to the district court for further proceedings.

## I. BACKGROUND

While patrolling the coastline of Key West, Florida, in a marked United States Customs boat, at 7:00 a.m. on November 23, 1979, Customs Officials Seals and Alaino approached a house occupied by the defendants. The house was divided into three apartments, two on the balcony level and one on the top floor. As their boat passed the house, the officers saw defendant Diaz on the balcony and asked him whether he had seen or heard any unusual boat traffic in the channel that night. After receiving abrupt, negative answers the officers ventured down a canal running alongside and behind the building. They observed defendant Fraga peering from behind one of the columns supporting the structure, and two other individuals inside the apartment behind Diaz, looking out from the door, then abruptly pulling back.

As Seals and Alaino docked their boat near the rear of the house, they again noticed Fraga, this time peering around the corner of a shed behind the building. Officer Alaino walked toward the shed and, when he was within a few feet of its entrance, shouted back to Seals that he smelled marijuana. Fraga, who had been slowly walking away from the shed, quickened his pace. Alaino pursued Fraga while Seals proceeded to the house.

When Officer Seals was within six to eight feet of the stairwell leading to the balcony and second-floor apartments, he detected a "very distinct heavy odor of marijuana." Standing in front of the screened entrance to the stairwell, he shouted to the individuals upstairs, identifying himself and requesting them to come down. As he approached the enclosure, he noticed marijuana residue on the flagstones outside the screen door and on the concrete slab of the foyer at the base of the stairs.

Within a few seconds of Seals' announced presence, defendant Acosta came down the stairs. With gun drawn, Seals asked Acosta, "What in the world is going on here?" Acosta replied, "You want money? We got money." A few moments later, Castro and Diaz descended and all three were placed in custody. Officer Alaino then returned with Fraga.

Further investigation revealed residue on the stairs leading to the second-floor apartments; four or five open shopping bags full of marijuana in the foyer area of the screened enclosure; a shed almost completely filled with bales of marijuana; numerous bales in apartment number 2–H on the second-floor; and a well-worn path running from the shed to the common foyer. No residue was found on any of the defendants, although approximately one ounce of marijuana was discovered in apartment 1–H, where two of the defendants had been seen as the boat approached. None of the defendants had a key to the locked shed or to any of the apartments.

Apartment 1–H, where two of the defendants were observed peering out of the door, was rented to one Donald Washbish, who was in Miami at the time of the arrest. Washbish knew none of the defendants and had given no one permission to use the apartment in his absence. Apartment 2–H, which contained the bales, was leased to one John Acosta, whose identity and possible relationship to defendant Acosta are unknown.[1]

In explaining his presence at the house, defendant Acosta testified at the suppression hearing that he and his wife had been invited to a party to be held there by a man named John, a fisherman from whom Acosta had occasionally bought seafood products. The party was also purportedly attended by defendants Castro, Diaz and Fraga, whom Acosta contends he had not met before that night. Following a dispute at the party between Acosta and his wife, Mrs. Acosta left, and Acosta, who had been drinking heavily, fell asleep. Although Acosta claims the party was in Apartment

1. Defendant Acosta's full name is Tomas Manuel Acosta. No evidence was offered as to the identity of John Acosta.

1–H, which was rented to Washbish and contained about an ounce of marijuana, his wife testified that the party was in Apartment 2–H. The other defendants did not testify at the suppression hearing.

At the conclusion of the *James* hearing, the district court suppressed Acosta's apparent bribery attempt as a statement made during a custodial interrogation in violation of his fifth amendment rights under *Miranda*. The court also found insufficient independent evidence of a conspiracy and therefore granted defendants' motion to suppress the hearsay declarations of codefendants. The government contends the district court erred in granting both motions to suppress. We agree and reverse the rulings of the district court.

## II. *MIRANDA* RIGHTS

■ In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court established certain procedural safeguards designed to protect the rights of an accused, under the Fifth and Fourteenth amendments, to be free from compelled self-incrimination during custodial interrogation. These warnings were designed to protect against the evils of "custodial interrogation" and they were not intended to unduly interfere with a proper system of law enforcement or to hamper the police's traditional investigatory functions. *Id.* at 481, 86 S.Ct. at 1631. Thus, before the warnings need be given, it must be established that the subject was both "in custody" and under "interrogation" by police officers.

The Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* This court in *United States v. Lueck,* 678 F.2d 895, 900 (11th Cir.1982), set out a four-factor test for determining whether a declarant is in custody, to wit: (1) the existence of probable cause to arrest; (2) the subjective intent of the

police; (3) the subjective belief of the defendant; and (4) the focus of the investigation.

■ Applying these factors to the facts of this case there is little doubt that Acosta was in custody and that he was the subject of a custodial interrogation.[2] After Officer Alaino had detected a strong odor of marijuana, Officer Seals approached the residence, identified himself and shouted for the occupants of the second floor to come down. Defendant Acosta was the first to exit and, as he descended the stairway, he confronted Seals, who had drawn his gun. The agent, asked Acosta, "What in the world is going on here?" Acosta replied, "You want money? We got money." Even though no *Miranda* warnings had been given to Acosta at this time, we reverse the district court's suppression of the statement since we find that the statement was totally voluntary and clearly outside the protective umbrella of *Miranda.*

■ The Supreme Court has consistently stated that not "all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Rhode Island v. Innis,* 446 U.S. 291, 299, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980). In *Miranda* itself, the Court stated in clear terms: "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478, 86 S.Ct. at 1629. Officer Seals exclaimed, "What in the world is going on here?" Defendant Acosta responded, "You want money? We got money." This statement was totally unresponsive to Seals' question. It was not improperly compelled by the officer's question in a custodial setting but, on the contrary, was spontaneously volunteered by Acosta in a deliberate attempt to commit a totally separate crime—bribery of a law enforcement official. The safeguards of *Miranda* can not be extended that far. An attempt to

---

**2.** The government acknowledges that Acosta was deprived of his freedom when he made the statement and therefore was in custody but they contend that the exchange did not consti-

tute an interrogation, but rather was a statement normally attendant to arrest. We disagree and find that the question posed to Acosta amounts to an interrogation.

commit another crime designed to interfere with a police officer's carrying out of his duties simply must be beyond the intent of *Miranda*.[3] This spontaneously volunteered bribery attempt is admissible since it is exactly the type of statement which the Supreme Court excluded from the *Miranda* rule. *See, e.g., United States v. Mulherin,* 710 F.2d 731 (11th Cir.1983); *United States v. Trosper,* 450 F.2d 319 (5th Cir.1971).

We have found no authorities that squarely address the problem we face in this case. However, in *United States v. Menichino,* 497 F.2d 935 (5th Cir.1974),[4] the defendant volunteered inculpatory statements during the course of biographical questioning by the police and such were held admissible. The court held these statements admissible because they were voluntary, and not made in response to any officer-initiated inquiries.[5] *Id.* at 938, 941.

Similarly, in *United States v. McDaniel,* 463 F.2d 129 (5th Cir.1972), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973), the court admitted a volunteered, incriminating statement made to a border patrol agent. In *McDaniel,* an inspector at a permanent immigration checkpoint, suspected the defendant of illegal possession of marijuana. He advised the defendant of his *Miranda* rights and proceeded to examine a number of burlap sacks in the defendant's automobile.[6] The agent asked the defendant if he had declared the sacks at the border. The defendant, in an apparent effort to exculpate himself from suspicion of crossing the border, volunteered that the substance in the sacks was marijuana and had been brought up-river by another individual. *Id.* at 131. The court admitted the statement since it found that it was entirely voluntary and not responsive to the question posed by the agent. *Id.* at 136.

The former Fifth Circuit, in the *en banc* decision of *Harryman v. Estelle,* 616 F.2d 870 (5th Cir.), *cert. denied,* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980), recognized a clear exception to the *Miranda* rule for voluntary unresponsive statements. There, the police arrested Harryman for possession of narcotics and a stolen firearm. They searched his person and at the base of his back, tucked under the waistband of his trousers, the officer discovered a condom containing a white powdered substance. Before reciting the *Miranda* warnings, the officer asked, "What is this?". Harryman responded that the substance was heroin. 616 F.2d at 873. The court held that Harryman's statement should have been suppressed as the product of an unlawful custodial interrogation.

The holding in *Harryman* does not control the issue at hand because the *Harryman* decision was based entirely on the fact that the officer's statement was an express

---

**3.** *Miranda* should not be applied to those areas where it was not designed to afford protection. Certainly, if Acosta had pulled a gun and said, "I'll show you what is going on!" and then proceeded to shoot Officer Seals, we would not suppress evidence of such conduct. Or, if a partner of Acosta had walked up behind Officer Seals with a drawn weapon and Acosta had said, "Drop your gun or my buddy will blow your head off!", we would not suppress it. *Miranda* should be applied broadly and rigidly but only in those areas where it was designed to afford protection. In an analogous context, some federal courts have held that post-indictment statements obtained in violation of the sixth amendment right to counsel are nonetheless admissible when the statements either concern other criminal acts or actually constitute separate criminal conduct. *See United States v. DeWolf,* 696 F.2d 1 (1st Cir.1982); *United States v. Moschiano,* 695 F.2d 236 (7th Cir. 1982) *cert. denied,* —— U.S. ——, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983); *Grieco v. Meachum,* 533 F.2d 713 (1st Cir.) *cert. denied,* 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976); *Mealer v. Jones,* 573 F.Supp. 675 (S.D.N.Y.1983).

**4.** The *Eleventh Circuit in Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), adopted as binding precedent decisions of the Fifth Circuit rendered prior to October 1, 1981.

**5.** The defendant in *Menichino,* unlike Acosta, had been advised of his *Miranda* rights but the court did not find the statement admissible on that basis. The court admitted the statement because it found that it was not a response to any of the biographical questions being posed to the defendant but rather was a volunteered statement not protected by *Miranda*.

**6.** The court's opinion was once more based on the voluntariness of the statement and not on the fact that *Miranda* warnings were given.

question and not a spontaneous exclamation. The nature of Harryman's response was not an issue since it directly answered the officer's inquiry. Unlike the Court in *Harryman,* we are not concerned with the nature of the officer's statement since we have found that Acosta was the subject of a custodial interrogation. Instead, our primary concern is with the nature of Acosta's response. Harryman answered the officer's inquiry with a statement directly responding to the question. Acosta's statement, an apparent bribery attempt, does not respond to the agent's demand, "What in the world is going on here?". The content of Acosta's response takes it beyond and outside both *Miranda* and *Harryman.*

As stated by the *Harryman* court, its conclusion would have been different had Harryman's statement been voluntary and unresponsive. In Footnote 4, 616 F.2d 874, the court stated:

> The state argues that the question asked was 'a question in form only in the sense that it was uttered in general wonderment,' that it therefore did not call for an answer, and thus that Harryman's response should be considered independently from the question as a statement that he simply 'volunteered.' *See Miranda v. Arizona,* 384 U.S. at 478, 86 S.Ct. at 1629. ('Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.')
>
> The state does not contend, nor does it appear, that Harryman's statement was unresponsive to the officer's question and thus volunteered within the meaning of our decision in *United States v. Menichino,* 497 F.2d 935, 941 (5th Cir.1974) (holding admissible statements volunteered by accused during booking process but not in response to officer-initiated inquiries). *See also United States v. LaMonica,* 472 F.2d 580, 581 (9th Cir.1972).

Suppression of Acosta's unresponsive statement would be in direct conflict with the very fountainhead of *Miranda.* The Supreme Court clearly stated in *Miranda* that voluntary statements of any kind are not barred by the Fifth Amendment nor has their admissibility been affected by the *Mi-*

*randa* decision or its progeny. 384 U.S. at 478, 86 S.Ct. at 1629.

▇▇▇ *Miranda* does not erect an absolute *per se* bar on any conversation with the accused by the investigating officer. It must be applied instead with flexibility and realism. *Per se* rules too often force us to lose touch with the reasons for their creation. The whole purpose of *Miranda,* and thus of its rule, is to protect the privilege against self-incrimination from coercive questioning by the police and to ensure that any waiver of that right is made "voluntarily, knowingly and intelligently." 384 U.S. at 444, 86 S.Ct. at 1612. "You want money? We got money." These utterances were not responsive to any interrogation. The statement was not only totally voluntary but also constituted a deliberate attempt to commit a separate crime. Such a declaration is clearly outside the protection of *Miranda.* The district court erred in suppressing Acosta's statement.

### III. STATEMENTS OF COCONSPIRATORS

▇▇▇ The next question presented is the admissibility of Acosta's statement against the codefendants. The test for admissibility of hearsay statements of alleged conspirators is well established in this circuit. The statements will be admitted only if the government presents substantial, independent evidence demonstrating (1) the existence of a conspiracy, (2) that the complaining defendant and the declarant were both members of the conspiracy, and (3) that the statement was made in the course of and in furtherance of the conspiracy. *United States v. Yonn,* 702 F.2d 1341 (11th Cir. 1983). The substantial, independent evidence of a conspiracy must be "at least enough to take the question to the jury." *United States v. James,* 590 F.2d at 581, quoting *United States v. Nixon,* 418 U.S. 683, 701 n. 14, 94 S.Ct. 3090, 3104 n. 14, 41 L.Ed.2d 1039 (1974).

The district court refused to admit Acosta's statement against Acosta's codefendants, holding that the government failed to

satisfy the first prong of the *James* standard:

> .The law is abundantly clear that, when four people are in one place at one time and may be all violating the law, [that] doesn't establish a conspiracy. There has to be some agreement or understanding, either tacit or overt, to establish an agreement between one or more individuals to violate the law....

> So what we have at this point is, we have a house, we have a shed, we have a lot of marijuana, and we have four people there. Well, that may be a lot of things, but I don't think it is a conspiracy.

January 29, 1982, Transcript of Suppression Hearing at 154–55.

■ A finding by a trial court that the government has not offered substantial, independent evidence of a conspiracy is a factual determination, which includes both a quantitative and qualitative evaluation of the evidence. *United States v. Perry,* 624 F.2d 29, 30 (5th Cir.1980). This court will overturn the findings of the trial court only if they are clearly erroneous. *United States v. Bulman,* 667 F.2d 1374, 1379 (11th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). Although we must defer to the ability of the district court to assess and evaluate the weight of the evidence and the credibility of witnesses, if after a review of the record we are left with the "definite and firm conviction that a mistake has been committed," we must reverse the court's decision. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 96 L.Ed.2d 746 (1948); *Bulman,* 667 F.2d at 1379.

■ The record in this case reveals significantly more evidence of a conspiracy than, as the district court concluded, the coincidence of four people staying in a house near a shed containing marijuana. Undisputed evidence established that marijuana was present in noticeable quantities on the floor of the common foyer area and on the only staircase leading to the second-floor balcony occupied by the defendants. Open shopping bags of loose marijuana were in plain view in the foyer, contributing to a heavy odor of marijuana detecta-ble several feet from the screened enclosure. The smell of marijuana was also noticeable within several feet of the shed. A well-worn path led from the shed full of bales to the foyer area. Several bales were discovered in one of the second-floor apartments and a small amount of marijuana was found in the other.

In addition to the abundance of marijuana in and around the house, the arresting officers observed three of the defendants peering at them from behind an apartment doorway and around one of the building's support columns. They also observed one of the defendants attempting to leave the property at an accelerated pace after Officer Alaino shouted that he smelled marijuana near the shed. Moreover, the defendants were discovered in an apartment leased to a man who had given no one permission to occupy the premises in his absence.

The issue is whether it was clearly erroneous for the district court to conclude that these facts do not amount to substantial, independent evidence of a conspiracy to possess and distribute marijuana. After a review of the record and the law in this circuit, we are convinced that the court's conclusion was in error. We therefore reverse on this ground.

More than one year after the district court entered its order suppressing coconspirators' hearsay statements this court decided *United States v. Blasco,* 702 F.2d 1315 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983). In a factual setting similar to this case the court held the evidence was sufficient to support convictions for conspiracy to possess and distribute marijuana. The defendants in *Blasco* argued, as they do here, that the evidence showed no more than their "mere presence" at the scene of the crime and that evidence of presence alone is insufficient to sustain a conspiracy charge. In upholding the convictions this court explained:

> While mere presence alone is inadequate to link a defendant to a conspiracy, *United States v. DeSimone,* 660 F.2d 532, 537 (5th Cir.1981), *cert. denied,* 455 U.S. 1027,

102 S.Ct. 1732, 72 L.Ed.2d 149 (1982), the *totality of the circumstances* surrounding these appellants' arrest evidences much more than mere presence.

702 F.2d at 1331–32 (emphasis added).

As in this case, *Blasco* involved an off-loading operation of a large number of bales of marijuana at a coastal residence in the Florida Keys. There the testimony established the following circumstantial evidence of a conspiracy: The house was located in an isolated, secluded area; during more than an hour of observation in the middle of the night, arresting agents from 200 yards away heard the sound of boats entering the canal leading to the house, followed by numerous thudding noises; and the aroma of marijuana pervaded the area surrounding the residence. When the agents announced their presence and came onto the property in the midst of the unloading operation, the participants attempted to flee. The majority of the twenty-nine defendants were arrested on the grounds or in one of the boats. Eight others were apprehended inside the house, which contained no marijuana; nor was there evidence of residue on any of these defendants' clothing. Nevertheless, the court concluded that the evidence was sufficient to support their conspiracy convictions, reasoning, "[I]t strains the imagination to think that these appellants were not aware of the off-loading taking place...." *Id.* at 1332. Emphasizing that the defendants must have heard the noise and smelled the marijuana, the court held that a jury could infer the occupants of the house were involved in the drug conspiracy. *Id.*

■ Given our decision in *Blasco,* we cannot let stand the district court's conclusion that the four defendants in this case were merely present in the house. Independent evidence supporting an inference of participation in a drug conspiracy is at least as strong as it was in *Blasco.* Although there was no evidence that defendants were present during the unloading of the bales, there is substantial evidence that they had to have been aware of a large amount of marijuana on the premises. A strong odor of marijuana could be detected near the shed, as well as the common foyer, through which defendants must have passed to reach the second-floor apartments. Loose marijuana filled grocery bags and covered portions of the foyer and the only stairway to the second floor. A well-worn path led directly from the stairway to the bales stored in the shed, and some marijuana, albeit a small amount, was discovered in the apartment in which the defendants were last seen. The four defendants acted in an apprehensive manner as the agents approached the property, and one defendant attempted to leave the area when an agent began to suspect illegal activity. Furthermore, the defendants were present in an apartment without permission of its lessee. While presence alone or even presence coupled with flight, without more, does not establish participation in a conspiracy, *United States v. Lopez-Ortiz,* 492 F.2d 109, 115 (5th Cir.), *cert. denied,* 419 U.S. 1052, 95 S.Ct. 630, 42 L.Ed.2d 647 (1974); *United States v. DeSimone,* 660 F.2d 532, 537 (5th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982), presence and flight are factors to be considered with other evidence in evaluating the "totality of the circumstances," *Blasco,* 702 F.2d at 1332, by which a jury can determine whether the evidence supports a finding of guilt beyond a reasonable doubt. Moreover, as was pointed out in *United States v. Lopez-Llerena,* 721 F.2d 311 at 312 (11th Cir.1983), both *DeSimone* and *Lopez-Ortiz* were decided prior to *United States v. Bell,* 678 F.2d 547 (5th Cir. Unit B 1982) (*en banc*), *aff'd on other grounds,* —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983), which specifically held:

> It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

*Id.* at 549.

Thus, under the *Bell* standard, the test is whether, based upon the totality of the circumstances, the evidence supports a find-

ing of guilt beyond a reasonable doubt. Examining the totality of the circumstances in this case, we find it difficult to believe that the defendants were unaware of the presence of a substantial amount of marijuana.

■ Although *Blasco* involved a question of the sufficiency of the evidence to sustain a conviction, we find it persuasive on the issue of the admissibility of coconspirator's hearsay statements. In both instances the court must determine whether there is substantial evidence to support a conclusion that a conspiracy existed and that the defendant was a knowing participant in that conspiracy. *See United States v. Davis,* 666 F.2d 195, 201 (5th Cir.1982) (Unit B); *United States v. Yonn,* 702 F.2d at 1348. A court will not uphold a conspiracy conviction unless a reasonable jury could find that the evidence is sufficient to establish a conspiracy beyond a reasonable doubt. *United States v. Bell,* 678 F.2d at 549. In deciding a *James* issue the court must determine whether there is sufficient independent evidence of a conspiracy to submit the question to the jury. *United States v. James,* 590 F.2d at 580–81. The inquiries, although not identical, are sufficiently similar on the facts of this case to warrant our reliance on the *Blasco* decision.[7]

Viewing the totality of the circumstances surrounding the arrests, we conclude that there was substantial, independent evidence of a conspiracy. We remand to the district court to determine whether the other two elements of the *James* standard are satisfied as to Acosta's statement and any other statements of the alleged coconspirators.

## IV. CONCLUSION

The district court erred in concluding that the prosecution's use of Acosta's statement against him at trial would violate the teachings of *Miranda*. The statement should not be suppressed as against defendant Acosta. We also reverse the district court's holding that there was insufficient independent evidence of a conspiracy to admit the hearsay statements of alleged coconspirators. The matter is remanded for further proceedings.

REVERSED and REMANDED.

KRAVITCH, Circuit Judge, concurring in part, dissenting in part:

I respectfully dissent from Part II of the majority opinion. I concur in the remainder.

Although recognizing that Officer Seals' express, accusatory question constituted a custodial interrogation under *Miranda* and *Innis,* the majority would nevertheless admit the statement because the answer does not appear to be responsive to the question. In my view such a rule is not only an unwarranted extension of the case law of the Supreme Court and this circuit, but an impractical and difficult rule to apply as well.

In addressing the admissibility of statements made in a custodial setting, courts

---

7. The most immediately apparent difference between a *James* issue and a sufficiency of the evidence question is that the former is limited to an evaluation of evidence *excluding* the hearsay statement itself. Once admitted into evidence, of course, the statement may be considered when determining whether the verdict is sufficiently supported by the evidence. *See United States v. Roper,* 681 F.2d 1354, 1359 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983). Since *Blasco* involved no hearsay evidence, this difference does not affect the decision's authority in this case.

Another analytical difference is that in determining whether the evidence is sufficient to support a verdict, the court must view the evidence in the light most favorable to the government. *See United States v. Davis,* 666 F.2d 195, 201 (5th Cir. Unit B 1982). In contrast, in determining whether to suppress a hearsay statement of an alleged coconspirator, the trial court is permitted to weigh and evaluate the credibility of witnesses and other evidence. *See United States v. Perry,* 624 F.2d at 30. The district court in this case held that the physical circumstances surrounding the arrest amounted to nothing more than mere presence. Our disagreement is based solely on our evaluation, in light of *Blasco,* of the uncontrovertible, physical evidence presented at the suppression hearing. Had the district court's decision been based upon credibility decisions, rather than an evaluation of the "hard" evidence, this court would defer to its judgment and leave its findings undisturbed.

consistently have focused on the conduct of the police and not the response of the accused. The concern of the Supreme Court in *Miranda* was that the interrogation environment created by the interplay of questioning and custody would place inherent pressure on an accused to compromise his right against compulsory self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 1619, 16 L.Ed.2d 694 (1966). It was the coercive setting created by the law enforcement officers that created the need for *Miranda's* prophylactic requirements.

This approach was reiterated in *Innis,* where the Court defined interrogation as any practice that the police should know is reasonably likely to evoke an incriminating response. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980). The Court emphasized that it was defining interrogation in terms of police action, and not the nature of the response, when it stated, "By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." *Id.* n. 5. In *Innis,* as in *Miranda,* the Court was principally concerned with discouraging police conduct likely to yield incriminating statements.

In *Harryman v. Estelle,* 616 F.2d 870 (5th Cir.) (en banc), *cert. denied,* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980), the former Fifth Circuit also defined interrogation in terms of police conduct when it rigidly applied *Miranda* in suppressing a statement made in response to a relatively innocent, but express, accusatory question. *Harryman* is indistinguishable from this case except that Harryman's statement appeared to respond to the question, while Acosta's did not. The majority views this distinction as dispositive of the issue, rendering Acosta's statement voluntary and therefore beyond the intended scope of *Miranda.* Although the Court in *Harryman* suggested that the result might have been different had Harryman's answer been unresponsive to the question, I cannot agree with this court's adoption of that dicta as a rule of law. *Harryman* stands for the proposition that *Miranda* will be rigidly applied when a law enforcement officer asks an accusatory question that is likely to elicit an incriminating response:

> When a law enforcement officer asks a question of an accused and the accused, without the benefit of *Miranda's* safeguards, answers, the totality of the circumstances is irrelevant. The accused's answer is simply inadmissible at trial as part of the prosecution's case in chief.

616 F.2d at 874.

*Harryman, Innis* and *Miranda* focused on the nature of the police conduct precisely because deterring unlawful interrogations is the principal motivation for imposing *Miranda's* procedural safeguards. *See Miranda,* 86 S.Ct. at 1612–18. This court's holding now departs from that approach by requiring an additional inquiry into the responsiveness of the reply, an inquiry wholly unrelated to the chief purpose underlying the *Miranda* requirements.

Nor is this case controlled by *United States v. Menichino,* 497 F.2d 935 (5th Cir. 1974), or *United States v. McDaniel,* 463 F.2d 129 (5th Cir.1972), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973), where the incriminating statements were made following *innocent inquiries* that were not designed to place any compelling pressures on the suspect to divulge any wrongdoing. In *Menichino* the statement followed a series of routine biographical questions, while in *McDaniel* the statement was a response to a common border patrol inquiry. In contrast to the situation presented here, the policies behind *Miranda's* safeguards—deterring police interrogation tactics and allaying the fears of an accused in an inherently coercive atmosphere—would not have been furthered by suppressing the remarks of the defendants in those cases.

Officer Seals asked Acosta a question designed to elicit an incriminating response in a custodial setting, which the majority correctly concludes constituted a custodial interrogation. Our inquiry should end there. The rule set out today does nothing to discourage police from asking express, accusatory questions to a suspect held in custody. Law enforcement officers are free to ask questions before giving *Miranda* warn-

ings in hopes of eliciting a statement that might be considered "unresponsive" to the question. They will have much to gain and nothing to lose.

Moreover, emphasizing the nature of the response will require unnecessary and frequently very difficult judicial inquiries to determine whether or not the declarant was responding to a question. As an illustration, suppose Acosta had replied, "This is an off-loading operation, but if you keep quiet, we'll make it worth your while—you want money, we've got money." Would the entire statement be admissible, or would a court consider the "unresponsive" part voluntary and the "responsive" part a product of the interrogation? Requiring a factual inquiry to determine whether the answer, in whole or in part, is unresponsive to the question and therefore voluntary is a regression to pre-*Miranda* law, where admissibility depended upon "a totality of the circumstances evidencing involuntary ... admission of guilt." *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963); *see also Miranda,* 86 S.Ct. at 1642 (Clark, J., concurring in part, dissenting in part). The Supreme Court in *Miranda* rejected this flexible approach in favor of a rigid rule that easily could be followed by police and applied by the courts. *See* 86 S.Ct. at 1618. The Fifth Circuit acknowledged the virtues of inflexible application when it stated in *Harryman:*

> Under *Miranda,* courts have no reason or mandate to consider whether, as the state suggests here, a law enforcement officer's question was not really a question because, objectively considered, it did not call for a response. As this case itself illustrates, this would entail just the kind of difficult and often impossible factual inquiry the *Miranda* rules purposely preempt.

616 F.2d at 874.

The rigidity of *Miranda's* requirements was originally intended and continues to be recognized as the doctrine's greatest strength. *Fare v. Michael C.,* 439 U.S. 1310, 99 S.Ct. 3, 5, 58 L.Ed.2d 19 (1978) (Rehnquist, J., granting application for stay); *Mi-*

*randa,* 86 S.Ct. at 1630; *Harryman,* 616 F.2d at 873. The Supreme Court has stressed that "one virtue of *Miranda* [is] the fact that the giving of warnings obviates the need for a case-by-case inquiry into the actual voluntariness of the admission of the accused," *California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981), and has recognized that a court ordinarily should not review a case involving application of *Miranda* to a particular set of facts. *Id.* 101 S.Ct. at 2807.

This court now requires a factual inquiry into the character of a suspect's response following a direct, accusatory question asked in a coercive, custodial setting. In this case we might conclude with some degree of certainty that Acosta's answer was so unresponsive to Officer Seals' question as to render it "voluntary" in the traditional sense. In subsequent cases this factual determination may not be as straightforward. Under the inherently compelling pressures of a custodial interrogation, it would not be unusual for a suspect to make a statement that does not appear to respond to the question posed. Courts will now be called upon to inquire into the mind of the suspect to determine whether the response was the product of an interrogation or was truly volunteered.

Rigid application of *Miranda* may suppress some statements that could be considered "voluntary." *See Miranda,* 86 S.Ct. at 1618. A rule linking admissibility to a court's determination of responsiveness, however, will likely admit some statements that are actually products of the questions asked. Given the uncertainties inherent in a court's determination of responsiveness and the well-settled policy of deterring police custodial interrogations unless *Miranda's* safeguards are followed, I believe the most prudent course is to adhere to the "core virtue" of *Miranda, Michael C.,* 99 S.Ct. at 5, and hold that a suspect's answer, however unresponsive, to a law enforcement officer's express, accusatory question posed in a coercive, custodial setting is inadmissible as a violation of the suspect's privilege against self-incrimination.[1]

1. Although the issue is not presented here, I    would not object to admitting Acosta's reply in

I would therefore affirm the district court's order suppressing the statement as against appellee Acosta.

a subsequent prosecution for attempted bribery. Nor would I require suppression of statements such as those described in footnote 3 of the majority opinion in a separate prosecution for murder or attempted murder. Since no person has a constitutional right to be warned of his rights before he commits a crime, such statements could conceivably form the bases of separate indictments and could be offered to prove the charges. In the pending prosecution, however, the government offers the statement as an admission or awareness of past wrongdoing, which the fifth amendment prohibits.

Cases from other circuits addressing a similar issue in the context of a sixth amendment violation are distinguishable. See Majority Opinion at n. 3. The Supreme Court has recognized that analyses of the fifth and sixth amendments are not interchangeable, "since the policies underlying the two constitutional protections are quite distinct." *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 1689 n. 4, 64 L.Ed.2d 297 (1980); *see,* Kamisar, *Brewer v. Williams, Massiah* and *Miranda:* What is "Interrogation"? When Does it Matter?, 67 Geo. L.J. 1, 48–55 (1978).