**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Freddie Lee McDONALD, a/k/a Walter McDonald, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,**

v.

**Carlos PONTON, Defendant–Appellant, Cross–Appellee.**

**Nos. 89–5269, 89–5549.**

United States Court of Appeals, Eleventh Circuit.

July 17, 1991.

---

Angela L. Jacobs, Tallahassee, Fla., for Freddie L. McDonald.

Fred A. Schwartz and Raoul Cantero, Adorno, Zeder, Allen, Yoss, Bloomberg & Goodkind, Miami, Fla., for Carlos Ponton.

Dexter W. Lehtinen, U.S. Atty., Donna A. Bucella, Linda C. Hertz, Roberta K. Flowers, Anne R. Schultz, Harriett Galvin, Donna A. Bucella, and Lynne Lamprecht, Asst. U.S. Attys., Miami, Fla., for the U.S.

Before CLARK, Circuit Judge, and HILL * and COFFIN **, Senior Circuit Judges.

CLARK, Circuit Judge:

Defendants Carlos V. Ponton and Freddie Lee McDonald bring this appeal from their convictions on an indictment charging that they conspired to possess at least five kilograms of cocaine with intent to distribute in violation of 21 U.S.C. § 846. In addition, the government brings a cross-appeal from Ponton's sentencing.

I.

Posing as a seller of cocaine, an undercover DEA agent met with Ponton on July 26, 1988 to negotiate the sale of twenty kilograms of cocaine. The agent had been introduced to Ponton through a confidential informant (CI) whose only role was to make the introduction between the agent and Ponton. On August 2, the two met again, and Ponton asked the agent to smuggle 100 kilograms of cocaine from Colombia into Georgia and then make arrangements to transport this shipment to Chicago. Ponton also stated that he had a friend coming in from Chicago who needed ten to fifteen kilograms of cocaine immediately. Ponton and the undercover agent met for a third time on August 8 during which Ponton asked the agent's pilot to fly to Mexico to pick up 70 kilograms of cocaine. Ponton also stated that his friend from Chicago was arriving the next day and that he was bringing money to buy ten to fifteen kilograms of cocaine. At trial, the government contended that McDonald was the "man from Chicago."

On August 9, the undercover agent met with Ponton and was introduced to Al Castaneda.[1] Ponton indicated that his Chicago friend had only enough money to buy five kilograms, but that the remaining money would arrive that night. The three men arranged to complete the delivery of the cocaine the next morning in the parking lot of the hotel where his Chicago friend was staying. Castaneda stated that he would be waiting in a black van in the parking lot of the hotel where the cocaine was to be delivered.

Ponton and Castaneda were observed driving to the hotel on the morning of August 10 and parked two places from a black van with Illinois license plates. They went into the hotel lobby where they made a phone call. Castaneda then exited the lobby and returned a short time later with McDonald and carrying a brown leather bag. Castaneda went back out to the car and placed the bag in the back seat while McDonald remained in the lobby, just inside the glass doorway facing outward with an unobstructed view of the parked car and van. Ponton and McDonald were observed talking by the pay phones. A short time later, McDonald went outside to the parking lot, spoke with Castaneda who then placed the bag in the trunk of the car, and they both returned to the lobby together.

The undercover agent later arrived at the hotel, entered the lobby, and then went with Castaneda and Ponton to the parking lot. McDonald remained in the lobby and

* See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.
** Honorable Frank M. Coffin, Senior Circuit Judge, U.S. Court of Appeals for the First Circuit, sitting by designation.

1. Castaneda was indicted along with Ponton and McDonald, but pled guilty prior to trial. He did not testify at the trials of either McDonald or Ponton.

observed the parking lot through the glass doorway. In the parking lot, the agent was shown the brown bag in the trunk which contained $77,530 in stacks of twenty, fifty, and hundred dollar bills wrapped in rubber bands. The agent then displayed to Ponton and Castaneda a bag of dummy packages made to resemble cocaine and immediately arrested the pair. A key was found in Castaneda's pocket which fit the black van. Inside the van, the agents found two hotel registration forms bearing McDonald's name. In addition, the number of one of McDonald's rooms was written on Castaneda's palm. One of the agents later testified that the van was registered to a Freddie Lee McDonald in Illinois.

McDonald had moved outside during the transaction, but after seeing the arrest of Ponton and Castaneda, he reentered the hotel and moved quickly to the elevator where he was arrested by other agents. Upon his arrest, McDonald was found with $8,600 in currency in denominations of twenty, fifty, and hundred dollar bills held together with a rubber band. McDonald's identification reflected that he was from Chicago. The hotel records revealed that McDonald had arrived at the hotel on August 9.

At trial, Ponton testified that he was an adherent to the Santeria religion and that the CI, a Santeria priest, became his spiritual advisor. In June, 1988, Ponton stated that he had borrowed some money from the CI, and when he had difficulty repaying it, the CI had pressured him into cooperating with the undercover DEA agent to buy the cocaine. He claimed that he was introduced to the agent in July by the CI as the "bad man" who was actually owed the money. Ponton alleges that the undercover agent suggested that the debt could be repaid if Ponton agreed to locate a buyer for some drugs. As a result, Ponton introduced the agent to Castaneda, who made all the arrangements for the delivery of the cocaine. Ponton claimed that he was essentially a bystander during the controlled delivery of the cocaine in the parking lot and had no active involvement in the transaction. The record shows, however, that the government was able to impeach signif-

icant portions of this testimony and that it seriously called into question the veracity of Ponton's story. At their separate trials, both Ponton and McDonald were convicted on the conspiracy charge, but were acquitted of attempting to possess cocaine with intent to distribute.

## II.

### A.

Ponton contends that the CI was a material witness to his defense, as spelled out by his trial testimony, that he was entrapped by the undercover agent into attempting to purchase the cocaine. He claims that the government violated both an order of the district court and fundamental fairness when it failed to disclose the CI's address or produce her for an interview more than a day prior to trial.

Prior to trial, Ponton filed a motion requesting an *in camera* hearing to determine whether the identity of the CI should be disclosed or whether the CI should be produced for an interview. In his order of February 13, 1989, the magistrate found that Ponton's motion was actually a request for access to the CI because Ponton already knew the CI's identity. The magistrate therefore ordered the government to produce the CI only if she was in "the actual physical control of the government." Shortly prior to trial, Ponton filed another motion for the government to produce the CI on the ground that he did not know her whereabouts. The government responded that it did not intend to call the CI as a witness; that she was not in the custody of the United States; and that she did not want to communicate with Ponton's defense counsel. On the day that the trial was to begin, immediately prior to jury selection, the government did produce the CI for an interview and explained that it had not earlier disclosed the CI's address for reasons of security. The district court thereafter afforded defense counsel an opportunity to interview the CI in the courthouse. After attempting such an interview, defense counsel notified the court that the CI had declined to be interviewed.

The district court advised defense counsel that the CI would be made available during trial if they desired to call her as a witness at trial. Ponton did not object to this ruling or request an *in camera* interview of the CI and never called her as a witness.

■ At the outset, we note that this is not the typical case involving the scope of the government's privilege to withhold from disclosure the identity of its confidential informants. In most cases involving confidential informants, the defendant does not know the identity of the informant and the government attempts to hide that identity.[2] In this case, however, Ponton knew the identity of the CI and, as a result of their spiritual relationship, obviously had some familiarity with her. Even if the district court had held that the government did not need to disclose the identity of the CI, Ponton would not have been prejudiced in any way.[3] There is also nothing in the record to suggest that the CI was under the actual physical control or custody of the government and that Ponton was effectively denied access to her. Since the government does not have the general obligation to guarantee the presence of witnesses at trial, this should settle this matter. The parties, however, seemingly agree that Ponton's spiritual advisor was a CI, and we therefore analyze this claim under that doctrinal rubric.

■ In determining whether the concept of fundamental fairness implicit within due process requires that the government disclose the identity and whereabouts of an informant or render reasonable assistance in locating an informant, a reviewing court must weigh the facts of each unique case and balance them against a defendant's need for access to the witness and the government's interest in withholding the identity or whereabouts of the informant.[4] A defendant can tip this balance in his favor if he establishes that an informant played an active or prominent role in the criminal activity.[5] We have previously held, however, that access to an informant was properly denied where "the informant had merely introduced undercover agents to the defendant and then assumed the role of an advisor."[6] The record in this case indicates that the CI had essentially no role, other than to make the necessary introductions, in the meetings leading up to Ponton's arrest where the exact details of the cocaine transaction were worked out. Indeed, the CI was not even present at the August 10 meeting in the parking lot where Ponton attempted to buy cocaine from the undercover DEA agents. We therefore cannot conclude that the CI's participation in the criminal activity was anything more than minimal.

■ A defendant may also successfully challenge the denial of access to an informant if he can prove that the informant's probable testimony would bear a direct relationship on the defendant's asserted defense.[7] However, "[m]ere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure. The defendant must show that the informant's testimony would significantly aid in establishing an asserted defense."[8] Although the only evidence presented at trial that supported Ponton's defense of entrapment was his own testimony, it is clear that the CI, if Ponton's story is treated at face value, would be in a

---

**2.** See, e.g., *Rovario v. United States,* 353 U.S. 53, 56–59, 77 S.Ct. 623, 626–27, 1 L.Ed.2d 639 (1957).

**3.** See *United States v. Johnson,* 892 F.2d 707, 710 (8th Cir.1989); *Renzi v. Commonwealth of Virginia,* 794 F.2d 155, 163 (4th Cir.1986) (Chapman, J., dissenting).

**4.** See *Roviaro,* 353 U.S. at 60–62, 77 S.Ct. at 627–29, 1 L.Ed.2d 639.

**5.** See *United States v. Kerris,* 748 F.2d 610, 613–14 (11th Cir.1984); *United States v. Diaz,* 655 F.2d 580, 587–88 (Sept. 1981 5th Cir. Unit B), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982).

**6.** *Kerris,* 748 F.2d at 614; *accord Diaz,* 655 F.2d at 588.

**7.** See *Kerris,* 748 F.2d at 614; *Diaz,* 655 F.2d at 588.

**8.** See *Kerris,* 748 F.2d at 614.

"unique position to affirm or deny" these allegations.[9]

We find, however, that Ponton suffered little, if any, prejudice from the government's failure to produce the CI more than a day prior to trial. It is clear that Ponton was not completely in the dark in making out his entrapment defense because he was generally familiar with the identity and background of the CI. More importantly, the government did produce the CI on the day that jury selection was set to begin and made her available for an interview by Ponton's defense counsel. The record reveals that defense counsel did, in fact, attempt to interview the CI, but she refused to talk with him. The CI was also available to be called as a witness by defense counsel. Although we do not sanction this exact procedure as the preferred method of granting access to a confidential informant or believe that it would be constitutionally acceptable under all circumstances, Ponton waived any challenge he might have had by failing to tender an objection to the district court's ruling or request a continuance. In addition, he has utterly failed to demonstrate how this admittedly belated access to the CI prejudiced in any way the presentation of his entrapment defense. We are therefore left with the unmistakable impression that the decision not to call the CI as a witness was a tactical decision on the part of Ponton and not one forced by any prior denial of access to the CI.[10] On these facts, we conclude that the government violated neither an order of the district court nor fundamental fairness in producing the CI for an interview by Ponton on the day of the trial.

### B.

The government also brings a cross-appeal from the district court's application of the sentencing guidelines in determining Ponton's sentence. The district court found that Ponton had negotiated for the purchase of ten kilograms of cocaine and therefore assigned a base offense level of 32.[11] The court also found that Ponton should not receive a two-level enhancement for obstruction of justice,[12] but granted him a two-level downward adjustment for acceptance of responsibility.[13] Applying an offense level of 30, the district court subsequently sentenced Ponton to 121 months in prison and five years of supervised release.

The government contends that the evidence presented at trial indicated that Ponton negotiated for the sale of fifteen to twenty kilograms of cocaine and that his base offense level should have been set at 34. The quantity of drugs involved in an uncompleted conspiracy for purposes of sentencing is a factual determination that is subject to review under the clearly erroneous standard.[14] Although there is testimony in the record suggesting that Ponton sought to purchase twenty kilograms for himself and also ten to fifteen kilograms for his friend from Chicago, we do not find that the district court clearly erred in determining that the quantity of cocaine involved in this conspiracy was ten kilograms. In light of the fact that Ponton sought only to purchase five kilograms during the controlled delivery, there was a factual dispute as to the actual quantity involved in this conspiracy and the district court's determination is therefore entitled to deference.

The government also argues that the district court should have granted Ponton a two-level upward adjustment for obstruction of justice on the ground that he

---

**9.** *United States v. Bower,* 575 F.2d 499, 503 (5th Cir.), *cert. denied,* 439 U.S. 983, 99 S.Ct. 572, 58 L.Ed.2d 654 (1978).

**10.** Similarly, we do not believe that the district court abused its discretion in failing to hold an *in camera* hearing on the CI's probable testimony. *See Kerris,* 748 F.2d at 614. The government made the CI available to Ponton to be called as a witness at trial and therefore any *in camera* hearing would have been moot.

**11.** *See* U.S.S.G. § 2D1.1(a)(3).

**12.** *See id.* § 3C1.1.

**13.** *See id.* § 3E1.1.

**14.** *See United States v. Alston,* 895 F.2d 1362, 1369–71 (11th Cir.1990).

perjured himself in making out his entrapment defense.[15] With only a cold, paper record before it, an appellate court is severely hindered in evaluating whether a defendant perjured himself at trial. The district court is uniquely suited to make such a determination because it heard all the evidence and was able to observe a particular witness' demeanor and behavior on the witness stand. Although the district court found that portions of Ponton's testimony were severely compromised by the testimony of more credible witnesses, it found that these inconsistencies did not rise to such a level as to require an upward adjustment in his sentence. After reviewing the record, we cannot conclude that this determination was clearly erroneous.[16] Finding no issues of merit, we conclude that the district court did not err in applying the sentencing guidelines in determining Ponton's sentence.

### III.

McDonald initially contends that there was insufficient evidence to support his conviction for conspiring to possess cocaine with intent to distribute. In order to sustain a guilty verdict for the offense of conspiracy, the government must prove that there was an agreement among two or more people to commit a crime and that the defendant knowingly participated in it.[17] As in most such cases, there is ordinarily little or no direct evidence of an illegal agreement; the existence of such an agreement may nevertheless be proven by circumstantial evidence.[18] Although a defendant's mere presence at the scene of a crime is alone insufficient to support a conviction for conspiracy, presence is a material and probative factor.[19] A defendant's flight from the scene of a crime is also another factor to be considered in determining whether the totality of the circumstances support the conclusion that the defendant entered into a conspiracy.[20]

Evaluating the evidence and drawing all reasonable inferences in favor of the jury's verdict,[21] we find that there was more than sufficient evidence to support McDonald's conviction on the conspiracy count. The existence of a conspiracy between Ponton, Castaneda, and McDonald was provided initially by the discussions in the preliminary meetings with the undercover agent on August 2, 3, and 9. During those meetings, Ponton indicated that a "friend" from Chicago was arriving on August 9 and that his "friend" was seeking to purchase ten to fifteen kilograms of cocaine.

A number of reasonable inferences further establish that McDonald was the "friend from Chicago" for whom the cocaine was being purchased. Although he was traveling under an alias, McDonald's personal identification indicated that he was from the Chicago area. Also, McDonald's behavior during the transaction on August 10 strongly indicated that he was in league with Ponton and Castaneda to purchase the cocaine. McDonald was initially seen talking with Ponton and Castaneda in the hotel lobby and later stood in

---

15. *See* U.S.S.G. § 3C1.1 application note 1(c).

16. The government also argues that the district court's two-level downward adjustment in Ponton's sentence for acceptance of responsibility was clearly erroneous. Because the district court did not err in failing to give an upward adjustment for obstruction of justice, we need not reach this issue because Ponton's sentence falls within two sentencing ranges. At the sentencing hearing, the district court specifically set Ponton's sentence exactly between offense levels 30 and 32, so as to make the resolution of whether Ponton accepted responsibility for his crimes a moot question. As a result, there is also no need for us to reach this issue. *See United States v. White*, 875 F.2d 427, 432–33 (4th Cir.1989).

17. *See United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983).

18. *See United States v. Tamargo*, 672 F.2d 887, 889 (11th Cir.), *cert. denied*, 459 U.S. 864, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982).

19. *See United States v. Kincade*, 714 F.2d 1064, 1065 (11th Cir.1983).

20. *See United States v. Castro*, 723 F.2d 1527, 1534 (11th Cir.1984).

21. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

the lobby for several minutes while observing the transaction in the parking lot. When the transaction was seemingly completed, he went out into the parking lot, but immediately retreated when the other two were arrested. It was later discovered that the number of one of the hotel rooms registered in McDonald's name was written on Castaneda's palm. The black van that Castaneda had earlier stated would be used for the delivery of the drugs was registered in McDonald's name, it contained McDonald's hotel receipts, and the keys were in the possession of Castaneda. The bag of money appeared contemporaneously with McDonald's first sighting, and McDonald watched as Castaneda secured the bag in the truck. McDonald had on his person a large amount of cash that was similar in denomination and packaging to the money that was seized. Although no single piece of evidence is decisive, the whole sum of inferences from the evidence presented at trial adequately supports the conviction.

■■■ McDonald next contends that he was denied effective assistance of counsel in violation of the sixth amendment. This court has repeatedly held that claims of ineffective assistance of counsel are generally not cognizable for the first time on direct appeal because the record is invariably insufficient to review the merits of such a claim.[22] In this case, there is simply no basis upon which to review McDonald's claim that he was denied effective assistance due to various alleged errors by his trial counsel. As a result, this issue is not properly before the court at this time.

■■■ McDonald argues that hearsay statements made by Ponton and Castaneda were improperly admitted as statements of co-conspirators under Fed.R.Evid. 801(d)(2)(E) because there was no independent evidence tending to show that McDonald was part of the conspiracy. In particular, he claims that statements indicating that a man from Chicago was coming with money to purchase cocaine were inadmissible hearsay. We have held that statements of a co-conspirator may be admitted under this rule if there is substantial, independent evidence of the existence of the conspiracy "at least enough to take the question to the jury"; that the defendant and declarant were both members of the conspiracy; and that the statements were made in the course of and in furtherance of the conspiracy.[23]

Reviewing the record, we conclude that the district court's determination that independent evidence supported the fact that Ponton and Castaneda's hearsay statements were made in furtherance of a conspiracy that included McDonald was not clearly erroneous.[24] As we noted above in considering McDonald's sufficiency of the evidence claim, McDonald's unusual behavior during the controlled delivery of the cocaine in the parking lot on August 10 strongly indicated that he was part of a conspiracy to buy cocaine. Castaneda was also arrested with the keys to the black van that was registered to McDonald, and he also had one of McDonald's hotel room numbers written on his palm. The statements of Ponton and Castaneda, which may be considered, also indicated that the purchaser of the cocaine from Chicago was arriving on April 9, and the hotel records introduced at trial showed that McDonald did, in fact, register for his stay on that date. We therefore find that the district court did not err in holding that the prerequisites for admitting Ponton and Castaneda's statements under the co-conspirator exception to the hearsay rule were adequately satisfied.

---

**22.** See United States v. Griffin, 699 F.2d 1102, 1107–09 (11th Cir.1983).

**23.** See United States v. Yonn, 702 F.2d 1341, 1348 (11th Cir.), cert. denied sub nom. Weeks v. United States, 464 U.S. 917, 104 S.Ct. 283, 78 L.Ed.2d 261 (1983); United States v. James, 590 F.2d 575 (5th Cir.) (en banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). The district court,

however, may also consider the alleged co-conspirator's statements themselves to determine whether they are probative of the existence of a conspiracy. See Bourjaily v. United States, 483 U.S. 171, 180, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987).

**24.** See United States v. Castro, 723 F.2d 1527, 1533 (11th Cir.1984).

■ McDonald next argues that the district court erred in admitting evidence of two other, separate, unrelated drug transactions described in conversations between Ponton and the undercover DEA agent and that the court improperly instructed the jury on how this evidence should be considered. These statements concerning the other transactions were related as part of the preliminary negotiations leading to the attempted purchase of the cocaine. In particular, McDonald contends that the court should not have admitted statements made by Ponton in which he discussed the importation of 100 kilograms of cocaine from Colombia and 70 kilograms of cocaine from Mexico because such evidence had no relevance as to McDonald and should have been excluded under either Fed.R.Evid. 401, 403, or 404(b). Although there is some doubt as to whether these statements were properly admissible against McDonald, we find that any prejudice flowing from the admission of such evidence was harmless error.[25] Any prejudice was slight because McDonald's name was not even mentioned in the statements in which the two other contemplated drug transactions were discussed. The government also did not emphasize or even mention the additional transactions at any other part of the trial.

■ McDonald also argues that the district court's limiting instruction to the jury on how these statements should be considered was erroneous because it amounted to a direction of a verdict for the government.[26] This argument is utterly meritless. The limiting instruction was proper because it allowed the jury to consider the evidence of the unindicted transactions only for those subsidiary purposes as outlined in Fed.R.Evid. 404(b) and even instructed the jury that it need not consider the evidence at all. The limiting instruction was favorable to McDonald and did not prejudice him in any way.[27]

■ McDonald argues that the government established the ownership of the black van through impermissible hearsay by failing to lay a proper foundation for admission of this evidence under one of the exceptions to the hearsay rule. At trial, a DEA agent testified that he established ownership of the black van by calling a base operator who ran the license plate number through the computer. The ownership information was called up and transmitted to the DEA agent. At trial, defense counsel did not object to the hearsay nature of this evidence, but did object to the agent's source of knowledge and this objection was sustained. The government counsel then asked several foundational questions regarding the witness's source of knowledge. By failing to tender an objection to this testimony on the ground of hearsay, McDonald has waived any appellate review of this issue.[28]

■ McDonald contends that the district court improperly responded to the jury's queries concerning the ownership of the black van during its deliberations. Approximately one and a half hours into the

---

**25.** *See United States v. Chilcote,* 724 F.2d 1498, 1502 (11th Cir.), *cert. denied,* 467 U.S. 1218, 104 S.Ct. 2665, 81 L.Ed.2d 370 (1984).

**26.** "[A]ny defendant on trial in a criminal case is to be tried by the jury only as to those charges of alleged crimes that are set forth in the indictment in this case.

Now, the alleged conversation with regard to the Colombian airplane trip discussed and the alleged conversations with regard to the Mexican transaction for delivery into Georgia are not charged as crimes in this indictment to this defendant.

However, it is intertwined with the overall conversations that allegedly took place amongst the alleged co-conspirators, and to that extent, the jury may consider it in considering the frame of mind, the state of mind, the knowledge of the defendants with regard to narcotics. So I am permitting the testimony to remain in the record, but I'm instructing you that you're not to use these two events as the basis in and of themselves to constitute evidence for conviction of the crimes in the indictment. You can consider them, if you wish to do so. You need not do so. It's up to the jury as to how much or how little weight you give it as to whether or not it has any bearing on the state of mind, the intent, the knowledge of the defendants."

**27.** *See United States v. Dekle,* 768 F.2d 1257, 1263 (11th Cir.1985).

**28.** *See United States v. Hamilton,* 694 F.2d 398, 401 (5th Cir.1982).

deliberation, the jury asked whether it could have access to testimony recorded by the court reporter. The court instructed the jury to rely on its collective memory and that if it had any further questions, it should address these points specifically. Approximately 30 minutes later, the jury further asked:

"What was the first reference to the black van? What was said about it? At what date and during what meeting did the reference to the black van take place?"

After consulting with counsel, the court instructed the jury to rely on its collective memory on the grounds that it would be too difficult to pick through the transcript and single out each place in the trial where the black van had been mentioned. A trial court's response to a jury's question is entrusted to its own sound discretion and a conviction will not be reversed in the absence of an abuse of discretion.[29] In this case, McDonald failed to object to the district court's response to the jury's queries. He also fails to show in what manner the district court's response prejudiced him. Absent such an allegation, we cannot say on these facts that the district court abused its discretion in failing to read back selected portions of the transcript and instructing the jury instead to rely on its own collective memory.

McDonald also argues that the district court improperly instructed the jury that they should not be concerned about their responsibility for McDonald's punishment if he is convicted. Specifically, the district court instructed the jury that "[t]he question of punishment should never be considered by the jury in any way in deciding the case. If the defendant is convicted the matter of punishment is for the judge to determine." The instruction is a verbatim reiteration of this circuit's pattern jury instructions, and we have expressly approved similar language.[30] McDonald's claim on this issue is therefore meritless.

Finally, McDonald contends that the sentencing guidelines infringe on his right to appeal because he was unable to express acceptance of responsibility for his deeds at the sentencing hearing while he anticipated bringing this appeal. Specifically, section 3E1.1 allows a reduction in the base offense level by two levels "if the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." Most courts have held that this section—by providing the possibility for leniency—does not infringe on a defendant's exercise of his constitutional rights.[31] We similarly find that section 3E1.1 did not unconstitutionally prejudice or penalize McDonald for exercising his right to appeal from a conviction.

## IV.

Finding no issues of merit, the convictions of Ponton and McDonald are AFFIRMED.

**29.** *See United States v. Loyd,* 743 F.2d 1555, 1567 (11th Cir.1984); *United States v. Lopez,* 728 F.2d 1359, 1363 (11th Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 112, 83 L.Ed.2d 56 (1984); *United States v. Quesada–Rosadal,* 685 F.2d 1281, 1283 (11th Cir.1982).

**30.** *See United States v. McDonald,* 620 F.2d 559, 565 (5th Cir.1980).

**31.** *See, e.g., United States v. Henry,* 883 F.2d 1010 (11th Cir.1989) (holding that this section did not unconstitutionally burden a defendant's rights by either forcing him to confess to his own perjury or to forego taking the stand at trial to take advantage of this section.); *United States v. White,* 869 F.2d 822, 825–26 (5th Cir.), *cert. denied,* 490 U.S. 1112, 109 S.Ct. 3172, 104 L.Ed.2d 1033 (1989) (holding that this section does not infringe on defendant's right to jury trial by providing an incentive to accept a plea bargain). The Supreme Court has also held that a defendant's right to challenge a conviction is not chilled by the possibility that he may receive a higher sentence by a jury upon retrial. *See Chaffin v. Stynchcombe,* 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973).