UNITED STATES of America

v.

Brenda Faye BURKE.

No. CR84–339A.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 29, 1985.

Larry D. Thompson, U.S. Atty., Richard H. Deane, Asst. U.S. Atty., Atlanta, Ga., for plaintiff.

John Ellis, Federal Defender Program, Atlanta, Ga., for defendant.

## ORDER

FORRESTER, District Judge.

The defendant in this case, who has a previous felony conviction, has been charged with one count of unlawful possession of firearms in violation of 18 U.S.C. App. § 1202(a)(1). The case is pending before the court on the objected-to report and recommendation of the United States Magistrate, in which the Magistrate denied defendant's motion to suppress. For the reasons which appear herein, the Magistrate's report and recommendation are REJECTED, and defendant's motion to suppress is GRANTED.

On July 13, 1984, FBI Agent John Benesh executed an affidavit in support of the issuance of two search warrants. In narrative form, the affidavit averred as follows. On July 10, 1984, Agent Benesh was in-

formed by James Robert Collins, an independent contractor to Airborne Freight Corporation, that on July 9, 1984, a 1983 Dodge van, Georgia license number ABE598, was stolen from a service station in Sandy Springs, Georgia. The stolen van contained an interstate shipment of negotiable securities and correspondence. The driver of the stolen vehicle, an employee of Airborne Freight Corporation named Jerry Scott Neppes, advised Agent Benesh that immediately prior to the theft Neppes had observed two black females near the service station. These females were described by Neppes as follows: One black female, between five foot nine and five foot ten, of a heavy build, with a dark complexion, aged 20 to 25 years, with a shoulder length Afro hairdo, who was dressed in cut-off blue jeans and cut-off T-shirt. One black female, height between five foot two inches and five foot three inches, of a light complexion, age 20 to 25 years, with short, curly hair. Neppes informed Agent Benesh that he did not observe those individuals in the vicinity after the theft. On July 11, 1984, Agent Benesh spoke with a Donald J. Doss, an employee of Crawford and Company, who advised him that 62 payroll checks in the total amount of $35,689.31 had been in a shipment being sent by the Airborne Freight Corporation from Atlanta, Georgia, to Baltimore, Maryland, Annapolis, Maryland, Dallas, Texas, and Canada. The checks were drawn on the Trust Company Bank of Georgia and the Bank of Nova Scotia, and the domestic checks were beige in color.

On July 12, 1984, a confidential informant advised Agent Benesh that an individual named Ed, whose last name was unknown, was observed on July 10, 1984 to possess three payroll checks drawn on the Trust Company Bank of Georgia, which were beige in color. Ed was described as a black male drug addict, height five foot eight inches, weighing between 165 and 175 pounds, with a dark complexion, scarred face, and medium Afro hairdo. Of the checks observed in Ed's possession, one was payable to an individual in Dallas, Texas, and one was payable to an individual in Baltimore, Maryland. All three checks were observed in Ed's clothing, and he displayed a large number of checks in a white envelope. The envelope was kept in Ed's sister's apartment at "38 Throop Street, Apartment 840, Atlanta, Georgia." The confidential informant stated that Ed's sister's name is Brenda, last name unknown, and Brenda is a "fence" for many local thieves, and keeps stolen property in her apartment. The confidential informant further advised Benesh that the informant had overheard a conversation during the week of July 9, 1984 between Ed, Brenda, and another individual whose name is Robin, last name unknown, also known as Kojak. Kojak was described as a black female, height five foot ten inches to five foot eleven inches, with a heavy build, dark complexion, and shoulder length Afro hairdo, aged 25 to 28 years, who customarily wears cut-off T-shirts. The informant stated that the conversation which the informant overheard concerned Kojak's theft of a truck in Sandy Springs, Georgia, and the attempts by Kojak, Ed, and another female known as "Red" to pass checks and money orders stolen from the truck. Kojak had displayed numerous checks to the confidential informant, and stated that she and "Red" had other papers in her apartment. The informant advised Benesh that Kojak resides at apartment 854, 24 "Throop Street," Atlanta, Georgia.

Finally, the affidavit avers that the confidential informant had been a paid FBI informant in the past, who began providing reliable information in December 1981, but had been inactive since February 1983. During the informant's active period, he provided information which resulted in the identification and arrest of an armed robbery suspect, a burglary suspect, and four bank robbery suspects. The bank robbery suspects were later convicted.

The affidavit describes the locations for which the warrant is sought as follows:

  6. 38 Throop Street, is a two-story red brick building, trimmed in a reddish-brown paint with a shingled roof and three adjacent apartments, with apart-

ment 840 being the far left apartment at that address looking at it from the front.

7. 24 Throop Street, is a two-story red brick building, trimmed in a reddish-brown paint with a shingled roof and four adjacent apartments, with apartment 854 as the third apartment from the left at that address looking at it from the front.

On the strength of this affidavit, Magistrate Feldman issued two search warrants. The one which relates to the motion presently pending before this court authorized a search of the premises known as "38 Throop Street, being a two-story red brick building, trimmed in a reddish-brown paint with a shingled roof and three adjacent apartments, with apartment 840 being the far left apartment at that address looking at it from the front...." The warrant authorized a search for negotiable securities and checks which were part of and were traveling in interstate commerce, including but not limited to the securities described in paragraph three of the affidavit. The warrant was issued on July 13, 1984 at 12:01 p.m.

The warrant was executed by agents of the FBI and the Fulton County Police Department at 48 Troup Street, apartment 840, on July 13, 1984. At the evidentiary hearing on the motion to suppress, testimony was heard from two of the executing officers, M.L. Carson of the Fulton County Police Department, and Michael L. Smith of the FBI. Agent Smith testified that when the warrant was executed on the defendant's apartment, he was one of a group of agents and officers which included the affiant for the warrant, John Benesh. TR at 15–16. Agent Benesh accompanied the team which executed the other warrant approved by Magistrate Feldman, and Agent Smith led the team which searched apartment 840 on Troup Street. Agent Benesh discussed the case with Agent Smith prior to execution of the warrant, and indicated that Benesh had driven by the apartment before, and would indicate to Smith on the radio as they passed the apartment which one it was. TR at 16. Agent Smith testified that he had not seen the apartment prior to the time that they arrived to conduct the search pursuant to the warrant. *Id.* 48 Troup Street, apartment 840, is located in the Carver Homes Housing Project (TR 17, 20), but no mention of that fact was made in the warrant or the supporting affidavit. No two apartments within the Carver Homes Project have the same number. Agent Benesh had told Agent Smith that the warrant was to be executed at Troup Street (TR 18), and Agent Smith was unaware up until the date of the suppression hearing that the warrant and affidavit referred to a Throop Street (TR at 20). When the carloads of agents met in the parking lot outside Carver Homes, they were given instructions regarding the warrants, and all drove together into the apartment complex. *Id.* As they drove onto Troup Street, Agent Benesh said that this is Troup Street, and indicated that apartment 840 was the one which was to be searched. *Id.*

On arrival at apartment 840, Detective Carson of the Fulton County Police Department entered apartment 840, which is a two-story apartment. TR at 23. As he had been trained to do, Det. Carson moved to secure the most remote area of the apartment, by ascending the stairs and entering the bedroom area. TR at 23–24. In the bedroom, the defendant was seated on the bed and was platting a male individual's hair. TR at 24. Det. Carson asked both the defendant and the man seated on the bed next to her to stand, which they did. TR at 25. When the defendant stood up, Det. Carson saw a pistol on the bed underneath the defendant's right leg or right thigh area. *Id.* Det. Carson then asked whose pistol it was, and the defendant responded that it was hers. *Id.* Det. Carson picked up the pistol out of concern for his own security. TR at 24–26. After Det. Carson took possession of the gun, he laid it at the head of the steps at the feet of several agents who were standing at the head of the stairs for security purposes. TR at 33. Agent Smith, uncomfortable with the fact that a weapon was just "laying there," picked up the weapon, took it

outside, recorded the serial number, and ran a computer check on the serial number of the weapon to determine whether or not it was stolen. *Id.* at 33–34. It is standard FBI procedure to verify whether any weapon which comes into their possession is stolen. *Id.* at 34. While the computer check on the gun's serial number was being conducted, Agent Smith returned to the apartment and inquired as to the names, race, sex, and date of birth of all six of the individuals who had been found inside the apartment. TR at 35. Among those in the apartment was an individual named Ed. *Id.* Agent Smith then returned outside and initiated a computer check on each of the individuals as to whether they were wanted or whether they had any sort of criminal record. *Id.*

The computer search revealed that the gun had not been reported as stolen. *Id.* As to the individuals, the computer search revealed that the defendant in this case, Ms. Burke, had a criminal record in the state of Georgia with several convictions, although the records did not immediately reveal whether those were felony or misdemeanor convictions. TR at 35–36. Agent Smith had been told by Ms. Burke when he was inquiring as to the names of the individuals in the apartment that the weapon was hers, and upon discovering that Ms. Burke had some sort of a criminal record, he retained the weapon in his custody until such time as he could determine whether her prior conviction was for a felony or misdemeanor, since if it had been for a felony, the weapon was possible evidence of a federal firearms violation. TR at 36.

Other facts of significance for purposes of resolving the pending motion are that the reason Agent Smith took the weapon itself outside the apartment to the van, rather than just the serial number, was the safety of the officers inside the apartment. TR at 38. None of the individuals in the apartment, including the defendant, were read their rights pursuant to *Miranda,* since the agents did not have the intention of arresting anybody that day. TR at 39. One of the reasons Agent Smith asked who the gun belonged to was that he wanted to

know to whom he should return it. TR at 39. Finally, the parties have stipulated that on July 19, 1984, a female caller, identifying herself as the defendant, spoke to Agent Benesh at the FBI office inquiring as to how she could get her gun back which the agents had seized on July 13, 1984. When Ms. Burke was told that since she had a felony record she could not possess a gun, Ms. Burke asked whether the gun could be returned if it belonged to her ex-husband. Defendant's Objections to the Report and Recommendation of the Magistrate, p. 8.

The defendant has raised four objections to the Magistrate's Report and Recommendation. First, the defendant argues that the seizure of the pistol and the computer check of its serial number were unconstitutional. Second, the defendant argues that the warrant in question is invalid since it failed to describe with particularity the premises to be searched, as required by the fourth amendment to the United States Constitution. Third, the defendant argues that there was no probable cause for issuance of the warrant, and fourth, the defendant argues that her statements with respect to the ownership of the weapon were obtained in violation of the fifth amendment. This court has reviewed the matter *de novo,* and concludes that defendant's objection to the Magistrate's Report and Recommendation with respect to the particularity with which the warrant described the premises to be searched is well-founded, and is therefore sustained. The other grounds on which defendant objects to the Magistrate's Report and Recommendation are not persuasive.

After this court's announcement of its ruling on defendant's motion to suppress, the government filed a motion to supplement the record and for reconsideration. In support of said motion, the government submitted the affidavit of Agent Smith, in which he avers that he has discussed this matter with Agent Benesh, who told him that the confidential informant took Agent Benesh to the Carver Homes Housing Project, and pointed out the building and

apartment belonging to the defendant. Specifically, according to Smith's affidavit, Agent Benesh informed Smith that Benesh and the informant went to the location, the informant pointed out the building and apartment to Benesh, and that although Benesh did not observe a building number he did observe the apartment number 840 on the door. When Benesh executed the affidavit to obtain the search warrant, Benesh spelled the street name based upon a phonetic understanding of the informant's pronunciation, included the building number which the informant had given him, and included the apartment number which he had seen himself. Benesh further told Smith that Benesh was unaware of any mistake in the street name or the building number given in the affidavit and on the warrant, and that Benesh had relied upon the apartment number rather than the building number in swearing out the affidavit for the warrant.

Smith's affidavit further avers that according to the local directory of streets in metropolitan Atlanta, there is no "Throop" Street in the area. The court notes that the directory, which is attached to the affidavit as Exhibit 1, does indicate that in the Atlanta area there is a Thorpe Road. Finally, the affidavit avers that Smith went to the Carver Homes complex to determine whether there is a building number "38" in that complex, and Smith observed that the buildings adjacent to the defendant's building are numbered "36, 42, and 52," but that Smith observed no building number 38 on Troup Street at any point.

■ With respect to the constitutional sufficiency of the warrant at issue in this case, the court notes that the Magistrate's recommendation of denial of the motion to suppress was predicated on the fact that there is only one apartment 840 located in the Carver Homes Housing Project. However, the fact that the apartment which was to be searched was located in the Carver Homes Housing Project was not contained in either the affidavit or the warrant. Had that information been contained in the affidavit or the warrant, the court would have little difficulty in concluding that the warrant contained a sufficient description of the premises to be searched. *Cf. United States v. Melancon*, 462 F.2d 82, 94 (5th Cir.), *cert. denied*, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972). The proper legal standard for whether a warrant sufficiently describes the place to be searched is whether "the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched which is not the one intended to be searched under the search warrant." *United States v. Sklaroff*, 323 F.Supp. 296, 321 (S.D.Fla. 1971), and cases cited. *See also Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925).

This test looks to the face of the warrant to determine whether there is sufficient information to enable the executing officer to identify the place to be searched, but in some cases the information contained in the affidavit on which the warrant is based may provide adequate supplementation to make an indefinite description definite. *See* LaFave, *Search and Seizure*, § 4.5, pp. 74–75 (1978). Some cases have stretched this doctrine to the extent of including facts known by the executing officer which are not specifically stated in the affidavit, if the executing officer was the affiant, and the affidavit shows that the affiant had been to the premises which are being described in the warrant. *Id.* at p. 77. Neither of these doctrines can resurrect the warrant in the present case. The executing officer, Agent Smith, was not the agent who swore out the affidavit. In addition, the affidavit did not indicate on its face that the affiant had been to the location in question, and the affidavit provided no further clarification. The case at bar is not one where the warrant contained a minor error, but the officers had the premises in question under surveillance, or the address given in the warrant was a reasonable one for the officers to have assumed to be the actual address of the premises in question. *See United States v. Gitcho*, 601

F.2d 369, 372 (8th Cir.1979). Rather, the warrant in this case had the wrong building number, and the street name listed a street which does not exist in the City of Atlanta. The only correct information given in this warrant is the apartment number. Given that information, the court cannot say that there is no reasonable probability that the wrong premises may mistakenly be searched under this warrant. As noted above, although there is no "Throop Street" in the City of Atlanta, there is a "Thorpe" Road and a "Troup" Street.

The test is whether the warrant contained sufficient information to enable the executing officer to locate the place to be searched. *United States v. Darensbourg*, 520 F.2d 985, 987 (5th Cir.1975). The executing officer in this case was Agent Smith, and neither the warrant nor the affidavit taken together provided him with sufficient information to locate the premises he was to search. Agent Benesh apparently knew which apartment the informer was referring to, since Agent Benesh had been taken there by the informer. However, Agent Benesh was not the executing officer, and the test for whether a warrant is valid should not turn on the particularized knowledge of the officer who swears out the affidavit when that knowledge is not reflected in the affidavit.

■ The purpose of the requirement in the fourth amendment that a warrant describe with particularity the place to be searched is to minimize the possibility of searching the wrong premises. *United States v. Prout*, 526 F.2d 380, 387 (5th Cir.1976). Thus, minor errors or technical errors in the description contained in the warrant will not invalidate the warrant if other information either contained in the warrant, or the affidavit, or immediately apparent on viewing the premises, enables the officer executing the warrant to determine which premises is governed by the warrant. *Id; United States v. Darensbourg, supra*, at 988. *See also United States v. Gusan*, 549 F.2d 15, 17–18 (7th Cir.1977), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977).

■ In *United States v. Parmenter*, the Massachusetts District Court invalidated a warrant which authorized the search of an address described as "11 and 13 Benefit Street, Worchester, Massachusetts, a brick three-story duplex dwelling...." Upon execution of the warrant, the officers discovered that 11 and 13 Benefit Street actually contained eight apartments, and the officers searched all of them. The court noted that it would have been a relatively simple matter for the officers to determine *prior* to executing the affidavit for the warrant that the building in question in fact contained more than the two apartments which they thought they would be searching. Thus, the court held that there is a duty on the government, where possible, to provide detailed information in stating the premises to be searched in executing an affidavit for search warrant. *United States v. Parmenter*, 531 F.Supp. 975 (D.Mass.1982). This court concludes that this standard is a reasonable one. In *Parmenter*, the multi-occupancy character of the building in question was apparent upon viewing the building itself. In the case at bar, it would have been a relatively simple matter for Agent Benesh, when he was taken to the location by the confidential informant, to have found out the building number and the name of the street, the apartment was located on, and to have included that accurate information in the application for a search warrant. Moreover, there is no question but that Agent Benesh could have included the information that the apartment in question was located in the Carver Homes Housing Project. He did not do so. Once signed, a search warrant may be executed by any duly authorized officer listed thereon. For example, the warrant at issue in this case was directed to John R. Benesh, or "any other authorized special agent of the Federal Bureau of Investigation." There is no assurance that the officer who executed the affidavit will be present at the search, and an extra measure of care in making sure that the premises are described with particularity is therefore required. It appears to the court

that had Agent Benesh not accompanied the searching officers who executed this warrant and told them over the radio when they reached the Carver Homes Project that apartment 840 was located in a building he indicated, the executing officers could not have executed this warrant, or might have executed it on the wrong premises.

■ In its motion for reconsideration, the government argues that this court should apply the "good faith exception" adopted by the Supreme Court in *United States v. Leon*, 468 U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *Massachusetts v. Sheppard*, 468 U.S. ——, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). The Eleventh Circuit has held that the good faith exception of *Leon* and *Sheppard* should be applied in a situation where the basis for the motion to suppress was that the items in the search warrant were not particularly described. *United States v. Accardo*, 749 F.2d 1477 (11th Cir.1985). In *United States v. Leon*, the Supreme Court held that evidence seized pursuant to a warrant which was valid on its face, but which was later determined not to be supported by probable cause, should not be suppressed, if the officers executing the warrant acted in an objectively reasonable good faith belief in the validity of the warrant. 468 U.S. at —— – ——, 104 S.Ct. at 3419–20, 82 L.Ed.2d at 696–97. The court held that the purpose of excluding evidence which is obtained in violation of the Constitution is to deter police misconduct. *Id.* at —— – ——, 104 S.Ct. at 3412–13, 82 L.Ed.2d at 687–88. As the court held, "if exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers or the policies of their departments." at ——, 104 S.Ct. at 3419, 82 L.Ed.2d at 695.

Given the rationale of *United States v. Leon*, this court concludes that the deterrent purposes of the exclusionary rule would be furthered by invalidating the warrant at issue in this case. The Court noted in *Leon* that when a warrant that later is determined to be without probable cause is issued, the error is the magistrate's rather than the officer's. "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of fourth amendment violations." at ——, 104 S.Ct. at 3420, 82 L.Ed.2d at 697. In the present case, there was no error by the United States Magistrate. Rather, the error was Agent Benesh's in failing to make sure that he had the proper address for the apartment for which he sought a warrant. In issuing the warrant, the magistrate exercised none of his judicial judgment as to whether the address contained therein was proper. *Cf. United States v. Leon*, at —— – ——, 104 S.Ct. at 3416–17, 82 L.Ed.2d at 692–93 (probable cause should be determined by the magistrate, rather than the officer). The case at bar is also different from the situation in *Massachusetts v. Sheppard, supra*, in which the Court held that the good faith exception applied where the warrant contained errors on its face, which the officer called to the attention of the judge in question, and the officer was assured by the judge that the errors in the warrant would be corrected, and that the warrant was proper to execute. In the case at bar no one, including the officer, was aware that the address listed on the warrant did not exist. It is the officer who was in a position to make sure that the address was correct, however, not the magistrate.

The court concludes that the sanction of exclusion is appropriate in this case, since the fourth amendment imposes a duty on law enforcement officers to make sure that they are describing with accuracy and particularity the premises for which a warrant is sought. Therefore, the court concludes that this warrant is invalid as not describing with particularity the premises to be searched, and the good faith exception does not apply since the error in this case was the officer's, not the magistrate's. Therefore, defendant's motion to suppress should be granted. The Magistrate's recommendation is REJECTED, and defendant's motion to suppress is GRANTED.

■ The defendant has made three other arguments in her objections to the magistrate's report and recommendation. The first of these is that the warrant in question was not supported by probable cause. This argument is without merit. The proper test for whether there is probable cause when an affidavit and warrant are based on an informant's tip is whether, under the "totality of the circumstances" there is probable cause to believe the contraband or evidence is located in a particular place. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). Among the factors which are relevant for determining whether, in the totality of the circumstances, there is probable cause are: the informant's veracity; the informant's reliability; the informant's basis of knowledge; and the degree of corroboration of the informant's information. *Id.* The duty of a court reviewing the judgment of a magistrate that probable cause existed is to insure "that the magistrate had a substantial basis for concluding that probable cause existed." 103 S.Ct. at 2332. In the present case, the magistrate had a detailed affidavit which contained descriptions of individuals who the victim of the theft believed to have been involved in the theft, which descriptions matched the confidential informant's descriptions of the persons he thought were involved in the crime. The affidavit additionally contained information that the confidential informant had seen checks which could reasonably be believed to be the fruits of that crime in the possession of a man whom the confidential informant knew to live with his sister, Brenda. The affidavit also contained information concerning the confidential informant's past reliability, and the information that the basis of his knowledge was personal observation and a conversation he had personally overheard. Under the totality of the circumstances, the court cannot say that the magistrate did not have a substantial basis for concluding that probable cause existed. Defendant's argument in this respect is without merit.

■ The defendant additionally argues in the objections to the magistrate's report and recommendation that the statements she made to police officers regarding ownership of the weapon should be suppressed as having been obtained in violation of her fifth amendment rights. Specifically, defendant argues that she was in the custody of the agents at the time the statements were made, but had not been given her rights under *Miranda. Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that a person be advised of his constitutional rights prior to a "custodial" interrogation. The danger at which *Miranda* is aimed is that under the compulsive or coercive aspects of a custodial situation, an individual would be more likely to make incriminating statements involuntarily, without knowing of his fifth amendment rights. *United States v. Roark*, 753 F.2d 991 (11th Cir.1985). *Miranda* does not apply, however, to general on-the-scene questioning as to facts surrounding a crime, or other general questioning which occurs in the course of investigating a crime. *Id* at 992, citing *Miranda*, 384 U.S. at 477, 86 S.Ct. at 1629. The Supreme Court has additionally noted that there are certain kinds of questioning which are not considered to be detention for purposes of the fifth amendment. These include requesting identification, and detaining the person while the officer communicates with others in an effort to verify or confirm the identification or to determine whether a person of that identity is wanted. *See Michigan v. Summers*, 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340, citing 3 W. LaFave, *Search and Seizure* § 9.2, pp. 36–37 (1978).

The defendant in this case made three statements. First, when Det. Carson entered the bedroom and asked the defendant to stand up, he then asked whose gun was lying on the bed, and the defendant responded that it was hers. Second, when Agent Smith was asking biographical questions of the persons in the apartment, he inquired to whom the weapon belonged, so that he could return it to its proper owner after checking its serial number. At that time, the defendant responded that the

weapon was hers. Finally, on July 19, 1984, a female caller who identified herself as the defendant, called Agent Smith in an effort to find out when she could get her weapon back. The defendant's argument respecting the statements appears to be two-pronged. First, the defendant appears to be arguing that her rights under the fifth amendment have been violated as a result of her having been induced to give incriminating statements in the context of a custodial interrogation. Second, at least before the magistrate, the defendant appeared to be arguing that her statements were the product of an unlawful seizure, said seizure relating to the fact that the weapon had been taken by the officers.

Viewed in a fifth amendment light, in determining whether an individual is in custody for purposes of *Miranda,* this circuit applies a four-part test, first enunciated in *United States v. Warren,* 578 F.2d 1058 (5th Cir.1978) (en banc). *See also United States v. Castro,* 723 F.2d 1527, 1530 (11th Cir.1984), and *United States v. Lueck,* 678 F.2d 895, 900 (11th Cir.1982). In *Warren,* the court held that the focus should be on whether probable cause to arrest the person has arisen, whether the subjective intent of the officer is to hold the person, whether the subjective belief of the person was that he was in custody, and whether the investigation had focused on the person at the time of the interrogation. *United States v. Warren, supra,* at 1071. None of these factors are met in the present case. When Det. Carson first found the defendant seated on the bed and asked her to stand up, then spotted the gun on the bed, there was no probable cause to arrest the defendant, the officer did not have the subjective intent to arrest the defendant, and there was no evidence that the defendant believed herself to be in custody. The officer's purpose in asking whose weapon it was, he testified, and the defendant has not controverted, was so that once he took the weapon into custody for safety reasons he could later return it to its proper owner. The same is true of the generalized questioning later in the course of the search of all six persons found in the apartment.

There is no evidence that the defendant believed herself to be in custody, and, indeed, the officers testified that they had no intention of arresting anyone that day. At the time the questions were asked, and the defendant stated that the weapon was hers, there was no probable cause to arrest the defendant since the officers did not know at that time that the defendant had a record. Finally, the statement made on the telephone was voluntary and not the product of any questioning. This court concludes that none of the statements made by the defendant in this case were made in the context of a custodial interrogation, and therefore *Miranda* does not require suppression of her statements.

Although this circuit continues to apply the *Warren* test for custody in fifth amendment cases, *see Castro, supra,* it appears to this court that increasingly the test is becoming one of whether the individual "felt free to leave." In *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1979), a fourth amendment case, the Supreme Court held that the test for whether an individual has been "seized" for purposes of the fourth amendment is whether, in view of all of the circumstances, a reasonable person would have believed that he was not free to leave. 446 U.S. at 554, 100 S.Ct. at 1877. Examples of the kind of seizure to which the court referred included the threatening presence of several officers, display of a weapon, physical touching of the person, or use of the language or tone of voice to indicate the compliance with the officer's request might be compelled. *Id.* *Mendenhall* is not a fifth amendment case, and hence did not deal with the question of whether the court's enunciation of the standards for "seizure" would also apply in the context of "custody," for purposes of the fifth amendment. However, in *United States v. Castro, supra,* the Eleventh Circuit held that the defendant in that case was in custody, since the government had conceded that the defendant was "deprived of his freedom." 723 F.2d at 1530, n. 2.

The Supreme Court has recently analyzed *Miranda* in the context of whether the "fruit of the poison tree doctrine" from the fourth amendment should be applied to *Miranda* violations. In *Oregon v. Elstad,* —— U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Court held that the fruit of the poison tree doctrine sweeps far broader than *Miranda,* and a *Miranda* violation does not necessarily create a presumption of irrevocable taint. *Id.* 105 S.Ct. at 1292. The purpose of *Miranda,* the Court noted, is to guard against the coercion of statements. In *Elstad,* the Court held that the officer had interrogated the defendant by telling the defendant, prior to giving the defendant his *Miranda* warnings, that he had heard that the defendant was involved in a robbery. The defendant responded that he had been at the house which was robbed. Subsequently, the defendant received his *Miranda* warnings, and thereafter signed a complete confession. The court held that the subsequent written confession did not have to be suppressed, although the defendant's initial statement in response to the unwarned question should be suppressed. The Court held that there was no presumption of coercion created by the simple fact that *Miranda* warnings had not been given, and the court must look to the particular circumstances of every subsequent statement in order to determine whether they were voluntarily given. 105 S.Ct. at 1293.

Although the *Elstad* case is not on point, it does emphasize the dichotomy between the fourth amendment and the fifth amendment for purposes of determining whether evidence should be suppressed. Statements given without *Miranda* warnings are to be suppressed only when they occur in the context of a custodial interrogation. This is so because a custodial interrogation creates a presumption of coercion. *Elstad,* 105 S.Ct. at 1292. In the present case, the questioning did not occur in the context of custody. There is no evidence of record that the defendant did not "feel free to leave." Absent some such evidence, the court concludes that defendant had not

been "seized" for fourth amendment purposes.

In addition, the court notes that interrogation is defined as "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *United States v. Glen-Archila,* 677 F.2d 809, 815 (11th Cir.1982), citing *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The question asked by Det. Carson in the present case as to whose weapon was on the bed after the defendant stood up was not a question which this court can say the officer should have known was reasonably likely to elicit an incriminating response. It is not a crime to own a weapon, and there is no evidence of record that Det. Carson knew that the defendant was a convicted felon, such that any response by her to that question could be incriminating. The same is true of the inventory-type question asked by Agent Smith, when he inquired as to the ownership of the weapon so that he could return it to the owner. Finally, there is no indication of coercion in the call made by Ms. Burke to Agent Smith. Although the defendant has argued that that statement was prompted by the unlawful seizure of the weapon, as is seen below, the seizure of the weapon was not unconstitutional.

In summary, the court concludes that the facts of this case do not reveal either that a custodial interrogation took place, or that the defendant did not feel free to leave rather than answer the questions she was asked. Viewed in that light, defendant's motion to suppress the statements she made to the officers must be denied.

The final issue raised by the defendant is her argument that the seizure of the gun, and the search of its serial number, constituted an unlawful search and seizure in violation of the fourth amendment. The government has responded by arguing first that the weapon was seized while in the plain view of the officers, falling within the plain view doctrine. The defendant argues that the plain view doctrine is not applicable in the present case since there was no

indication that the weapons were evidence of any crime. The plain view doctrine provides that where an officer has made a lawful entry into a particular location, and discovers evidence "inadvertently," the officer may seize the property if it is "immediately apparent" to the officer that the item observed "may be evidence of a crime, contraband, or otherwise subject to seizure." *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983).

■ In the present case, had this warrant been valid, the officers would have been lawfully on the defendant's premises. The defendant has not contested that the officer's discovery of the weapon was inadvertent, or that the weapon was in the plain view of the officer. The defendant argues that it was not "immediately apparent" to the officer that the weapon could be evidence of a crime, contraband, or otherwise subject to seizure. However, it appears to this court that seizure of a weapon found in plain view while executing a warrant for other items is constitutional even absent evidence that that particular firearm is evidence of a crime. In *United States v. Green*, 634 F.2d 222 (5th Cir. Unit B 1981), the defendant's premises were searched for evidence relative to drug dealing. The warrant did not specify firearms, but the court held that seizure of firearms found on the premises was proper under the plain view doctrine. 634 F.2d at 225, n. 4. Defendant's primary argument does not relate to the officer's seizure of the weapon, but to the computer search of its serial number which was subsequently conducted. As noted above, the weapon was initially seized for safety reasons, since the officer did not feel comfortable leaving a weapon inside the house while conducting a search pursuant to a warrant. Therefore, the officer took the weapon outside, and in the course of usual FBI procedure, ran a serial number check to determine whether the weapon was stolen. The court concludes that that action was not unreasonable. The officers had information which was contained in the warrant that the occupant of this apartment was a "fence" and it was not unreasonable for the officers to

determine whether the weapon was a stolen one. Although the computer check revealed that the weapon was not wanted as being stolen, a simultaneous computer check on the defendant's criminal record revealed that she had multiple convictions. The officer testified that in his experience a person who has multiple convictions almost certainly has a felony conviction among them. At that point, although there still was no confirmation that the defendant had a felony record, the officer had probable cause to seize the weapon as evidence of the crime of unlawful possession of a firearm by a felon. Once there was probable cause to seize the weapon, it is not relevant that it took several days to determine definitively that the defendant did in fact have a felony conviction. *See United States v. Johns*, — U.S. —, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985), in which the Supreme Court held that when the officers had probable cause to seize and open sealed containers located in a truck, and opened those packages three days later and found marijuana, suppression was not required simply because the officers had time to get a warrant to search the packages.

■ Moreover, the issue that the defendant has raised with respect to the computer search on the serial number of the weapon is simply not relevant. No evidence was obtained as a result of that search which could be used against the defendant even if that search was unconstitutional. In other words, even if running a computer check on the serial number of the weapon was unconstitutional, the officers obtained no "fruit" from that activity. The "fruit" came when the officers acquired sufficient facts to lead them to conclude that it was likely that the defendant in this case had a prior record of a felony conviction. This issue, viewed simply, is that officers executing a search warrant for certain documents came upon a weapon, and in the interest of safety, removed the weapon from the apartment for the duration of the search. That was not an unreasonable activity. Then, in the course of running a computer check on the occupants

of the apartment, which the Supreme Court has indicated is permitted (*see Michigan v. Summers, supra*), the officers obtained information which led them to believe that the fact that the defendant had had possession of this weapon made the weapon evidence of a crime, since the officers had information which led them to believe that the defendant had a felony conviction. Detention of the weapon after that point without a warrant, therefore, did not violate the defendant's constitutional rights. The officers came by possession of the weapon legally, and their continued possession after discovering the defendant's prior record was based upon probable cause.

In summary, the Magistrate's Report and Recommendation is REJECTED. The defendant's motion to suppress is GRANTED, on the sole ground that the warrant in this case did not describe with sufficient particularity the premises to be searched. The remainder of the bases of defendant's objections are without merit, and are rejected.